# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

GOODWATER HOLDINGS LLC,
a Florida limited liability company;
DIGICARE, INC., a Florida profit corporation;
and CLAYVARD LTD., a British Virgin
Islands limited company,

       Plaintiffs,

                                     Case No.

vs.

DEJ PARTNERS, LLC, a California limited
liability company,

       Defendant.

_____/

## VERIFIED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Plaintiffs GOODWATER HOLDINGS LLC, a Florida limited liability company ("GW"),

DIGICARE, INC., a Florida profit corporation ("DigiCare"), and CLAYVARD LTD., a British

Virgin Islands limited company ("Clayvard" and, together with GW and DigiCare, the

"Plaintiffs"), by and through the undersigned legal counsel, file suit against Defendant DEJ

PARTNERS, LLC, a California limited liability company (the "Defendant"), and alleges:

### JURISDICTION AND VENUE

1.      The United States District Court for the Middle District of Florida, Orlando

Division ("Court") has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332(a)(3)

because: (i) this case ("Case") is a civil action where the amount in controversy exceeds Seventy-

Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest and costs; (ii) GW,

DigiCare, and Clayvard are not citizens of the same state as the Defendant; and (iii) Clayvard is a

citizen or subject of a foreign state.

2.      Venue is proper in the Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the transactions, acts, and/or omissions giving rise to the causes of action asserted herein occurred within the state of Florida.

3.      This Court has jurisdiction over the Defendant because, in all relevant times, the Defendant engaged in business activities within the state of Florida and has otherwise purposefully availed itself of the Court's jurisdiction.

4.      Venue is proper in the Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) because the Defendant is subject to the jurisdiction of a court of general jurisdiction in Florida.  Specifically, the Defendant is subject to the jurisdiction of the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida because the Defendant engages in continuous and systematic general business contact with Florida.  § 48.193, Fla. Stat. (2019).

## PLAINTIFFS

5.      GW is a Florida limited liability company authorized to transact business in Florida. GW holds substantial ownership interests in NEOCRUMB, INC. ("NC2"), a Florida profit corporation, which is the successor entity of NEOCRUMB, LLC, a Florida limited liability company ("NC1").

6.      Clayvard is a multinational holding company which holds substantial ownership interests in NC2.

7.      DigiCare is a Florida profit corporation authorized to transact business in Florida. DigiCare, formerly known as HEALTH CHAIN SOLUTIONS, INC., adopted its current name on or around August 31, 2018.  HEALTH CHAIN SOLUTIONS, LLC, a Florida limited liability company ("HCS"), converted to HEALTH CHAIN SOLUTIONS, INC. on or around August 31, 2018.

## DEFENDANT

8.      The Defendant is a California limited liability company, and the successor-in-interest to DEJ FAMILY LIMITED PARTNERSHIP ("DFLP"), a California limited partnership that converted into the Defendant on or around June 21, 2019.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

9.      On or around July 26, 2017, HCS entered a loan agreement with DFLP (the "Loan Agreement").  A true and correct copy of the Loan Agreement is annexed hereto as Exhibit "A".

10.     Pursuant to the Loan Agreement, DFLP issued a loan to HCS in the principal sum of One Hundred Twenty-Five Thousand and 00/100 Dollars ($125,000.00).   The Loan Agreement's maturity date was July 26, 2019.  *Cf* Ex. A at 1, 3 (defining July 26, 2017 as the "Effective Date" and the "Maturity Date" as "the earliest to occur of . . . the two-year anniversary of the Effective Date[.]").

11.     The Loan Agreement states that HCS would be responsible for "attorneys fees[ ] incurred in terminating, enforcing . . . or defending the Loan Documents[.]"  Ex. A at 2.

12.     The Loan Agreement was secured by a Pledge Agreement of equal date ("Pledge Agreement"), which was entered by and among DFLP, GW, Clayvard, and HCS.  A true and correct copy of the Pledge Agreement is annexed hereto as Exhibit "B".

13.     Under the Pledge Agreement, GW and Clayvard each pledged Twenty-Five Thousand (25,000) membership units in NC1 to DFLP as pledged collateral (the "Collateral"); accordingly, the Collateral included Fifty Thousand (50,000) membership units in NC1.

14.     Section 14 of the Pledge Agreement provides, in pertinent part, that the Pledge Agreement "shall be governed by, and construed and enforced in accordance with, the internal laws in effect in the State of California without giving effect to the principals of conflict of laws[.]" Ex. B at 9.

15.     Section 8 of the Pledge Agreement provides the Defendant, as successor-in-interest to DFLP, certain remedies "[u]pon the occurrence and during the continuation of an Event of Default (and such Event of Default shall have continued unremedied for a period of 90 days after [HCS] and [GW/Clayvard] receives written notice from [the Defendant] specifying such failure)". *Id*. at 4.  Among the remedies provided for by the Pledge Agreement are the right of the Defendant to "transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral", "sell . . . the Pledged Collateral", and deduct from the proceeds of sale "all costs or expenses of any kind (including reasonable attorneys' fees and disbursements)".  *Id*.

16.     While the Pledge Agreement does not define "Default", the Pledge Agreement's stated purpose is to provide "security for the payment and performance of [HCS]'s obligations under the Loan Agreement".  *Id*. at 1.

17.     The Loan Agreement enumerates several events which would constitute an "Event of Default", first among them "[t]he failure to pay any installment of principal or interest on the Loan[.]"  Ex. A at 8.

18.     HCS defaulted on the Loan Agreement by failing to pay all outstanding principal on the loan by the Loan Agreement's maturity date.

19.     On or around October 28, 2019, the Defendant, as successor-in-interest to DFLP, sent HCS, GW, and Clayvard a letter entitled "Notice of Event of Default; Enforcement of Remedy" (the "Default Letter").  A true and correct copy of the Default Letter is annexed hereto

4

as Exhibit "C".  In the Default Letter, the Defendant provided notice it was transferring all the Collateral into its possession.  Ex. C at 2.

20.     One (1) or more of the Plaintiffs collectively made several requests that the Defendant dispose of the Collateral in a commercially reasonable manner, apply the proceeds to the Plaintiffs' indebtedness to the Defendant, and/or return the surplus from the Collateral's disposition.  The Defendant repeatedly refused to dispose of the Collateral in a commercially reasonable manner, refused to apply proceeds of the Collateral's disposition to the Plaintiffs' indebtedness, and asserted that interest would continue to accrue even after the Defendant took possession of the Collateral.

21.     On or around October 13, 2020, GW and Clayvard sent the Defendant an authenticated demand for proceeds from the Defendant's disposition of the Collateral (the "Authenticated Demand").  A true and correct copy of the Authenticated Demand is annexed hereto as Exhibit "D".

## COUNT I
## DECLARATORY RELIEF

22.     The Plaintiffs incorporate and re-allege paragraphs 1 through 19 above as if fully set forth hereinafter.

23.     The Collateral is worth approximately Four Hundred Forty Thousand and 00/100 Dollars ($440,000.00), whereas the Plaintiffs' outstanding obligations to the Defendant collectively total less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00).  The Defendant, despite knowing the Collateral's value well exceeded the Plaintiffs' indebtedness to the Defendant, took possession of all the Collateral.

24.     California Commercial Code Section 9610(b) provides, in pertinent part, that "[e]very aspect of a disposition of collateral, including the method, manner, *time*, place, *and other terms*, must be commercially reasonable."   Cal. Com. Code § 9610(b) (2020); *see also* § 679.610(2), Fla. Stat. (2019) ("[e]very aspect of a disposition of collateral . . . must be commercially reasonable.").   The Plaintiffs cannot—and could not—waive or otherwise modify California Commercial Code Section 9610(b)'s protections.  California Commercial Code Section 9602 states, in pertinent part, that "the debtor or obligor may not waive or vary the rules stated in . . . . Subdivision (f) of Section 9615[.]"  Cal. Com. Code § 9602 (2020); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.610(2)).

25.     California Commercial Code Section 9615(a) provides requirements for a commercially reasonable disposition; specifically, it establishes a fixed order in which "[a] secured party shall apply or pay over for application the cash proceeds of disposition".  Cal. Com. Code § 9615(a) (2019); *see also* § 679.608, Fla. Stat. (2019) (providing that " [a] secured party shall apply or pay over for application the cash proceeds of collection or enforcement under s. 679.607 in the following order . . . ").

26.     The secured creditor must first apply the cash proceeds from the Collateral's disposition to the reasonable costs and expenses incurred by the secured creditor, including, "to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses."  Cal. Com. Code § 9615(a)(1) (2019); *see also* § 679.608(1)(a)(1), Fla. Stat. (applying functionally the same standard).

27.     Next, the secured creditor must apply the cash proceeds from the Collateral's disposition to "[t]he satisfaction of obligations secured by the security interest . . . under which the disposition is made."  Cal. Com. Code § 9615(a)(2) (2019); *see also* § 679.608(1)(a)(2), Fla. Stat. (applying functionally the same standard).

28.     After that, the secured creditor—to the extent the collateral is not subject to consignment—must apply the remainder of the cash proceeds from the Collateral's disposition to "the satisfaction of obligations secured by any subordinate security interest in . . . the collateral", but only if "the secured party receives from the holder of the subordinate security interest . . . an authenticated demand for proceeds or notice of the levy of attachment or execution before distribution of the proceeds is completed."  Cal. Com. Code § 9615(a)(3) (2020); *see also* § 679.608(1)(a)(2), Fla. Stat. (applying functionally the same standard).

29.     Once the secured party has applied the proceeds of distribution in accordance with California Commercial Code Section 9615(a), California Commercial Code Section 9615(d)(1) states that "unless [Cal. Com. Code § 9615(a)(4)] requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus". Cal. Com. Code § 9615(d)(1) (2020); *see also* § 679.608(d), Fla. Stat. (2019) ("A secured party shall account to and pay a debtor for any surplus[.]").  The Plaintiffs cannot—and could not—waive the Defendant's obligations under California Commercial Code Section 9615(d).  *See* Cal. Com. Code § 9602(5) (stating a debtor or obligor may not waive the requirements set forth  in "subdivision (d) of Section 9615 to the extent that [it] require[s] accounting for or payment of surplus proceeds of collateral."); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.608(d)).

30.     California Commercial Code Section 9615(f) provides, in pertinent part, as follows:

"[t]he surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this chapter to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if . . . . [t]he transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor . . . [and the] amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought."

Cal. Com. Code § 9615(f) (2020); *see also* § 679.615(6), Fla. Stat. (2019) (providing an identical standard).

31.     The Defendant's failure to sell the Collateral for cash does not excuse the Defendant's obligation to apply or pay over noncash proceeds from the Collateral's disposition. A secured party must "apply or pay over for application noncash proceeds of disposition . . . [if] the failure to do so would be commercially unreasonable." Cal. Com. Code § 9615(c) (2020); *see also* § 679.608(3)(c), Fla. Stat. (2019) (providing an identical standard). Any such noncash disposition would also need to occur "in a commercially reasonable manner." *Id.*

32.     The Defendant has held the Collateral for almost One (1) year, has repeatedly refused to dispose of the Collateral, and has indicated that it would only dispose of the Collateral on commercially unreasonable terms, including the accrual and collection of interest after the Defendant took possession of the Collateral. The Defendant failed to dispose of the Collateral upon commercially reasonable terms when, *inter alia*, it: (i) repeatedly refused to do so; and (ii) threatened to dispose of the Collateral in a commercially unreasonable manner.

33.     California Commercial Code Division 9, Cal. Com. Code § 9101 *et seq.*, offers a variety of remedies if a party violates, or fails to abide by, its provisions. California Commercial Code Section 9625(b) provides, in pertinent part, that "a person is liable for damages in the amount

8

of any loss caused by a failure to comply with this division."  Cal. Com. Code § 9625(b) (2020); *see also* § 679.625(2), Fla. Stat. (2019) (providing similar relief).

34.     California Commercial Code Section 9625(c) provides California Commercial Code Section 9625(b)'s relief to "a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral".  Cal. Com. Code § 9625(c) (2020); *see also* § 679.625(3)(a), Fla. Stat. (2019) (providing similar relief).

35.     Each of the Plaintiffs are debtors, obligors, and/or hold a security interest in or other lien on the Collateral, and have been or done so at all relevant times the Defendant failed to comply with California Commercial Code Division 9, Cal. Com. Code § 9101 *et seq*.

36.     California Commercial Code Section 9626 governs "action[s] arising from a transaction . . . in which the amount of a deficiency or surplus is in issue[.]"  Cal. Com. Code § 9626(a) (2020); *see also* § 679.626, Fla. Stat. (2019) (governing functionally identical actions).

37.     California Commercial Code Section 9626(a)(2) states that "[i]f the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this chapter."  *Id*.  If the secured party "fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this chapter relating to collection, enforcement, disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited[.]"  *Id*.

38.     Specifically, a debtor or secondary obligor's liability for a deficiency is limited "to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of either of": (i) the proceeds collected, enforced, disposed, or accepted; or (ii) the amount

that would have been realized if the secured party proceeded in accordance with the California Commercial Code's terms.  *Id.*

39.     The Defendant's failure to dispose of the Collateral upon commercially reasonable terms has resulted in harm to the Plaintiffs.  The Plaintiffs have suffered harm because the Defendant disposed of the Collateral in a commercially unreasonable fashion.

40.     GW and Clayvard—which invest in companies in their ordinary course of business—suffered damages from the Defendant's failure to dispose of the Collateral upon commercially reasonable terms.  GW and Clayvard could have: (i) invested cash proceeds from the Collateral's disposition, or (ii) sold noncash proceeds from the Collateral's disposition, and invested the money earned therefrom.  Additionally, disposition of the Collateral upon commercially reasonable terms would have paid off any debts GW and Clayvard owed to the Defendant.

41.     Digi suffered damages because the Defendant failed to dispose of the Collateral on commercially reasonable terms, which would have paid off any debts Digi owed to the Defendant.  Additionally, Digi would have benefitted from a surplus if the Defendant disposed of the Collateral upon commercially reasonable terms, and would have been able to invest that surplus.  Further, the Defendant's failure to dispose of the Collateral upon commercially reasonable terms made it more difficult for Digi to borrow money or raise capital, as it would be required to disclose indebtedness that would otherwise not exist.

42.     The Plaintiffs are entitled to have their liability to the Defendant limited to Zero and 00/100 Dollars ($0.00), because the sum of the secured obligation, expenses, and attorney's fees GW owed the Defendant does not exceed the amount the Defendant would have realized if the Defendant had proceeded in accordance with the California Commercial Code's terms.

Additionally, GW and Clayvard are entitled to proceeds and/or surplus from the Collateral's disposition, and Digi is entitled to surplus from the Collateral's disposition.

WHEREFORE, the Plaintiffs respectfully pray: (i) for a declaration that the Plaintiffs liability to the Defendant totals Zero and 00/100 Dollars ($0.00); (ii) for a declaration GW and Clayvard are entitled to commercially reasonable proceeds and/or surplus from the Collateral's disposition; (iii) for a declaration Digi is entitled to commercially reasonable surplus from the Collateral's disposition; (iv) for entry of judgment awarding the Plaintiffs Five Hundred Ten Thousand Four Hundred and 00/100 Dollars ($510,400.00), together with the Plaintiffs' costs and reasonable attorneys' fees arising from this action, and postjudgment interest accruing at the statutory rate; and (v) for such other and further relief as the Court deems just and proper.

## COUNT II
## ACCOUNTING FOR COLLATERAL

43.     The Plaintiffs incorporate and re-allege paragraphs 1 through 19 above as if fully set forth hereinafter.

44.     The Collateral is worth approximately Four Hundred Forty Thousand and 00/100 Dollars ($440,000.00), whereas the Plaintiffs' outstanding obligations to the Defendant collectively total less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00).  The Defendant, despite knowing the Collateral's value well exceeded the Plaintiffs' indebtedness to the Defendant, took possession of all the Collateral.

45.     California Commercial Code Section 9608 provides, in pertinent part, that "[i]f a security interest or agricultural lien secures payment or performance of an obligation . . . . [the] secured party shall account to and pay a debtor for any surplus."  Cal. Com. Code § 9608 (2020); *see also* § 679.608, Fla. Stat. (2019) ("If a security interest or agricultural lien secures payment or

performance of an obligation . . . . [the] secured party shall account to and pay a debtor for any surplus[.]").

46.     Additionally, California Commercial Code Section 9615(d)(1) states that "unless [Cal. Com. Code § 9615(a)(4)] requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus".  Cal. Com. Code § 9615(d)(1) (2020); *see also* § 679.608(d), Fla. Stat. (2019) ("A secured party shall account to and pay a debtor for any surplus[.]").  The Plaintiffs cannot—and could not—waive the Defendant's obligations under California Commercial Code Section 9615(d).  *See* Cal. Com. Code § 9602(5) (stating a debtor or obligor may not waive the requirements set forth  in "subdivision (d) of Section 9615 to the extent that [it] require[s] accounting for or payment of surplus proceeds of collateral."); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.608(d)).

47.     The Plaintiffs seek for the Defendant to account to the Plaintiffs for any surplus.

WHEREFORE, the Plaintiffs respectfully pray: (i) for an accounting; (ii) for entry of judgment on Count II awarding the Plaintiffs costs and reasonable attorneys' fees arising from this action; and (iii) for such other and further relief as the Court deems just and proper.

## COUNT III
## FAILURE TO DISPOSE OF COLLATERAL IN A COMMERCIALLY REASONABLE MANNER

48.     The Plaintiffs incorporate and re-allege paragraphs 1 through 19 above as if fully set forth hereinafter.

49.     The Collateral is worth approximately Four Hundred Forty Thousand and 00/100 Dollars ($440,000.00), whereas the Plaintiffs' outstanding obligations to the Defendant collectively total less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00).

50.     The Defendant, despite knowing the Collateral's value well exceeded the Plaintiffs' indebtedness to the Defendant, took possession of all the Collateral.  Thereafter, the Defendant failed to dispose of the Collateral in a commercially reasonable manner by refusing, for almost One (1) year, to either: (i) return the Collateral to the extent its value exceeded the Plaintiffs' indebtedness to the Defendant; or (ii) sell the Collateral, apply the proceeds to pay off the Plaintiffs' indebtedness to the Defendant, and pay the surplus from the Collateral's disposition to One (1) or more of the Plaintiffs.

51.     California Commercial Code Section 9610(b) provides, in pertinent part, that "[e]very aspect of a disposition of collateral, including the method, manner, *time*, place, *and other terms*, must be commercially reasonable."  Cal. Com. Code § 9610(b) (2020); *see also* § 679.610(2), Fla. Stat. (2019) ("[e]very aspect of a disposition of collateral . . . must be commercially reasonable.").  The Plaintiffs cannot—and could not—waive or otherwise modify California Commercial Code Section 9610(b)'s protections.  California Commercial Code Section 9602 states, in pertinent part, that "the debtor or obligor may not waive or vary the rules stated in . . . . Subdivision (f) of Section 9615[.]"  Cal. Com. Code § 9602 (2020); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.610(2)).

52.     California Commercial Code Section 9615(a) provides requirements for a commercially reasonable disposition; specifically, it establishes a fixed order in which "[a] secured party shall apply or pay over for application the cash proceeds of disposition".  Cal. Com. Code § 9615(a) (2019); *see also* § 679.608, Fla. Stat. (2019) (providing that " [a] secured party shall apply or pay over for application the cash proceeds of collection or enforcement under s. 679.607 in the following order . . . ").

53.     To comply with California Commercial Code Section 9615(a), the secured creditor must first apply the cash proceeds from the collateral's disposition to the reasonable costs and expenses incurred by the secured creditor, including, "to the extent provided for by agreement and not prohibited by law, reasonable attorney's fees and legal expenses."   Cal. Com. Code § 9615(a)(1) (2019); *see also* § 679.608(1)(a)(1), Fla. Stat. (applying functionally the same standard).

54.     Next, the secured creditor must apply the cash proceeds from the Collateral's disposition to "[t]he satisfaction of obligations secured by the security interest . . . under which the disposition is made." Cal. Com. Code § 9615(a)(2) (2019); *see also* § 679.608(1)(a)(2), Fla. Stat. (applying functionally the same standard).

55.     After that, the secured creditor—to the extent the collateral is not subject to consignment—must apply the remainder of the cash proceeds from the Collateral's disposition to "the satisfaction of obligations secured by any subordinate security interest in . . . the collateral", but only if "the secured party receives from the holder of the subordinate security interest . . . an authenticated demand for proceeds or notice of the levy of attachment or execution before distribution of the proceeds is completed."   Cal. Com. Code § 9615(a)(3) (2020); *see also* § 679.608(1)(a)(2), Fla. Stat. (applying functionally the same standard).

56.     Once the secured party has applied the proceeds of distribution in accordance with California Commercial Code Section 9615(a), California Commercial Code Section 9615(d)(1) states that "unless [Cal. Com. Code § 9615(a)(4)] requires the secured party to apply or pay over cash proceeds to a consignor, the secured party shall account to and pay a debtor for any surplus". Cal. Com. Code § 9615(d)(1) (2020); *see also* § 679.608(d), Fla. Stat. (2019) ("A secured party shall account to and pay a debtor for any surplus[.]").   The Plaintiffs cannot—and could not—

waive the Defendant's obligations under California Commercial Code Section 9615(d).  *See* Cal. Com. Code § 9602(5) (stating a debtor or obligor may not waive the requirements set forth  in "subdivision (d) of Section 9615 to the extent that [it] require[s] accounting for or payment of surplus proceeds of collateral."); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.608(d)).

57.     The Defendant's failure to sell the Collateral for cash does not excuse the Defendant's obligation to apply or pay over noncash proceeds from the Collateral's disposition. A secured party must "apply or pay over for application noncash proceeds of disposition . . . [if] the failure to do so would be commercially unreasonable." Cal. Com. Code § 9615(c) (2020); *see also* § 679.608(3)(c), Fla. Stat. (2019) (providing an identical standard).  Any such noncash disposition would also need to occur "in a commercially reasonable manner."  *Id.*

58.     California Commercial Code Section 9615(f) provides, in pertinent part, as follows:

> "[t]he surplus or deficiency following a disposition is calculated based on the amount of proceeds that would have been realized in a disposition complying with this chapter to a transferee other than the secured party, a person related to the secured party, or a secondary obligor if . . . . [t]he transferee in the disposition is the secured party, a person related to the secured party, or a secondary obligor . . . [and the] amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party, a person related to the secured party, or a secondary obligor would have brought."

Cal. Com. Code § 9615(f) (2020); *see also* § 679.615(6), Fla. Stat. (2019) (providing an identical standard).

59.     The Defendant has held the Collateral for almost One (1) year, has repeatedly refused to dispose of the Collateral, and has indicated that it would only dispose of the Collateral on commercially unreasonable terms, including the accrual and collection of interest after the Defendant took possession of the Collateral.  The Defendant failed to dispose of the Collateral

15

upon commercially reasonable terms when it: (i) repeatedly refused to do so; and (ii) threatened to dispose of the Collateral in a commercially unreasonable manner.

60.      California Commercial Code Division 9, Cal. Com. Code § 9101 *et seq*., offers a variety of remedies if a party violates, or fails to abide by, its provisions.  California Commercial Code Section 9625(b) provides, in pertinent part, that "a person is liable for damages in the amount of any loss caused by a failure to comply with this division."  Cal. Com. Code § 9625(b) (2020); *see also* § 679.625(2), Fla. Stat. (2019) (providing similar relief).

61.      California Commercial Code Section 9625(c) provides California Commercial Code Section 9625(b)'s relief to "a person that, at the time of the failure, was a debtor, was an obligor, or held a security interest in or other lien on the collateral".  Cal. Com. Code § 9625(c) (2020); *see also* § 679.625(3)(a), Fla. Stat. (2019) (providing similar relief).

62.      Each of the Plaintiffs are debtors, obligors, and/or hold a security interest in or other lien on the Collateral, and have been or done so at all relevant times the Defendant failed to comply with California Commercial Code Division 9, Cal. Com. Code § 9101 *et seq*.

63.      California Commercial Code Section 9626 governs "action[s] arising from a transaction . . . in which the amount of a deficiency or surplus is in issue[.]"  Cal. Com. Code § 9626(a) (2020); *see also* § 679.626, Fla. Stat. (2019) (governing functionally identical actions).

64.      California Commercial Code Section 9626(a)(2) states that "[i]f the secured party's compliance is placed in issue, the secured party has the burden of establishing that the collection, enforcement, disposition, or acceptance was conducted in accordance with this chapter."  *Id*.  If the secured party "fails to prove that the collection, enforcement, disposition, or acceptance was conducted in accordance with the provisions of this chapter relating to collection, enforcement,

disposition, or acceptance, the liability of a debtor or a secondary obligor for a deficiency is limited[.]" *Id.*

65. Specifically, the debtor or secondary obligor's liability for a deficiency is limited "to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of either of": (i) the proceeds collected, enforced, disposed, or accepted; or (ii) the amount that would have been realized if the secured party proceeded in accordance with the California Commercial Code's terms. *Id.*

66. GW and Clayvard—which invest in companies in their ordinary course of business—suffered damages from the Defendant's failure to dispose of the Collateral upon commercially reasonable terms. GW and Clayvard could have: (i) invested cash proceeds from the Collateral's disposition, or (ii) sold noncash proceeds from the Collateral's disposition, and invested the money earned therefrom. Additionally, disposition of the Collateral upon commercially reasonable terms would have paid off any debts GW and Clayvard owed to the Defendant.

67. Digi suffered damages because the Defendant failed to dispose of the Collateral on commercially reasonable terms, which would have paid off any debts Digi owed to the Defendant. Additionally, Digi would have benefitted from a surplus if the Defendant disposed of the Collateral upon commercially reasonable terms, and would have been able to invest that surplus. Further, the Defendant's failure to dispose of the Collateral upon commercially reasonable terms made it more difficult for Digi to borrow money or raise capital, as it would be required to disclose indebtedness that would otherwise not exist.

68.     The Defendant's enforcement and disposition of the Collateral was not conducted in accordance with the California Commercial Code's terms and, accordingly, the Plaintiffs are entitled to compensation.

WHEREFORE, the Plaintiffs respectfully pray: (i) for entry of judgment on Count III awarding the Plaintiffs Five Hundred Ten Thousand Four Hundred and 00/100 Dollars ($510,400.00), together with costs and reasonable attorneys' fees arising from this action, and postjudgment interest accruing at the statutory rate; and (ii) for such other and further relief as the Court deems just and proper.

## COUNT IV
## BAD FAITH UPON PLEDGE AGREEMENT

69.     The Plaintiffs incorporate and re-allege paragraphs 1 through 19 above as if fully set forth hereinafter.

70.     The Collateral is worth approximately Four Hundred Forty Thousand and 00/100 Dollars ($440,000.00), whereas the Plaintiffs' outstanding obligations to the Defendant collectively total less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00).  The Defendant, despite knowing the Collateral's value well exceeded the Plaintiffs' indebtedness to the Defendant, took possession of all the Collateral.  Thereafter, the Defendant failed to dispose of the Collateral in a commercially reasonable manner by refusing, for almost One (1) year, to either: (i) return the Collateral to the extent its value exceeded the Plaintiffs' indebtedness to the Defendant; or (ii) sell the Collateral, apply the proceeds to pay off the Plaintiffs' indebtedness to the Defendant, and pay the surplus from the Collateral's disposition to One (1) or more of the Plaintiffs.

71.     As previously noted, the Pledge Agreement contains a provision requiring that it be governed by, and construed in accordance with California law, without giving effect to principles of conflict of laws.

72.     California Commercial Code Section 9610(b) provides, in pertinent part, that "[e]very aspect of a disposition of collateral, including the method, manner, *time*, place, *and other terms*, must be commercially reasonable."   Cal. Com. Code § 9610(b) (2020); *see also* § 679.610(2), Fla. Stat. (2019) ("[e]very aspect of a disposition of collateral . . . must be commercially reasonable.").   The Plaintiffs cannot—and could not—waive or otherwise modify California Commercial Code Section 9610(b)'s protections.  California Commercial Code Section 9602 states, in pertinent part, that "the debtor or obligor may not waive or vary the rules stated in . . . . Subdivision (f) of Section 9615[.]"  Cal. Com. Code § 9602 (2020); *see also* § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.610(2)).

73.     The Defendant acted in bad faith upon the Pledge Agreement by: (i) refusing to dispose of the collateral in a commercially reasonable fashion; (ii) failing to apply proceeds from the Collateral's disposition to pay off the Plaintiffs' indebtedness to the Defendant; and (iii) failing to return to the Plaintiffs the surplus resulting from the Collateral's disposition.

74.     GW and Clayvard—which invest in companies in their ordinary course of business—suffered damages from the Defendant's bad faith upon the Pledge Agreement.  If the Defendant had acted in good faith upon the Pledge Agreement, it would have disposed of the Collateral upon commercially reasonable terms.  GW and Clayvard, in turn, could have: (i) invested cash proceeds from the Collateral's disposition, or (ii) sold noncash proceeds from the Collateral's disposition, and invested the money earned therefrom.  Additionally, the commercially reasonable disposition would have paid off any debts GW and Clayvard owed to the Defendant.

75.     Digi suffered damages as a result of the Defendant's bad faith upon the Pledge Agreement.  If the Defendant had not acted in bad faith upon the Pledge Agreement, it would have disposed of the Collateral on commercially reasonable terms, which would have paid off any debts Digi owed to the Defendant.  Additionally, Digi would have benefitted from a surplus, and would have been able to invest that surplus.   Further, the Defendant's bad faith upon the Pledge Agreement made it more difficult for Digi to borrow money or raise capital, as Digi would be required to disclose indebtedness that would otherwise not exist.

76.     California Civil Code Section 1717(a) provides, in pertinent part, as follows:

> "In any action on a contract, *where the contract specifically provides that attorney's fees and costs*, which are incurred to enforce that contract, *shall be awarded either to one of the parties or to the prevailing party*, *then the party who is determined to be the party prevailing* on the contract, *whether he or she is the party specified in the contract or not*, *shall be entitled to reasonable attorney's fees* in addition to other costs. Where a contract provides for attorneys fees, as set forth above, that provision shall be construed as applying to the entire contract, *unless each party was represented by counsel* in the negotiation and execution of the contract, *and the fact of that representation is specified in the contract*."

Cal. Civ. Code § 1717(a) (2020) (emphasis added).

77.     Section 8 of the Pledge Agreement awards the Defendant "all costs or expenses of any kind (including reasonable attorneys' fees and disbursements)" in the event GW, Clayvard, and/or DigiCare default on the Agreement.  Ex. B at 4.  The Pledge Agreement does not specify that each party to the Pledge Agreement was represented by counsel in the negotiation thereof.  Given the foregoing, the Plaintiffs—in addition to being entitled to other and further relief—are entitled to reasonable attorneys' fees incurred in bringing this action.

WHEREFORE, the Plaintiffs respectfully pray: (i) for entry of judgment on Count IV awarding the Plaintiffs Five Hundred Ten Thousand Four Hundred and 00/100 Dollars ($510,400.00), together with costs and reasonable attorneys' fees arising from this action, and

postjudgment interest accruing at the statutory rate; and (ii) for such other and further relief as the Court deems just and proper.

## COUNT V
## BAD FAITH UPON LOAN AGREEMENT

78.     The Plaintiffs incorporate and re-allege paragraphs 1 through 19 above as if fully set forth hereinafter.

79.     The Collateral is worth approximately Four Hundred Forty Thousand and 00/100 Dollars ($440,000.00), whereas the Plaintiffs' outstanding obligations to the Defendant collectively total less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00). The Defendant, despite knowing the Collateral's value well exceeded the Plaintiffs' indebtedness to the Defendant, took possession of all the Collateral. Thereafter, the Defendant failed to dispose of the Collateral in a commercially reasonable manner by refusing, for almost One (1) year, to either: (i) return the Collateral to the extent its value exceeded the Plaintiffs' indebtedness to the Defendant; or (ii) sell the Collateral, apply the proceeds to pay off the Plaintiffs' indebtedness to the Defendant, and pay the surplus from the Collateral's disposition to One (1) or more of the Plaintiffs.

80.     Unlike the Pledge Agreement, the Loan Agreement does not contain a provision requiring that it be governed by, and construed in accordance with California law, without giving effect to principles of conflict of laws.

81.     Both California and Florida require that disposition of collateral, including the method, manner, time, place, and other terms, be commercially reasonable. *See* Cal. Com. Code § 9610(b) (2020) *and* § 679.610(2), Fla. Stat. (2019) ("[e]very aspect of a disposition of collateral . . . must be commercially reasonable."). Both California and Florida prevent the Plaintiffs from waiving or modifying commercial reasonability as to the Collateral's disposition. California

Commercial Code Section 9602 states, in pertinent part, that "the debtor or obligor may not waive or vary the rules stated in . . . . Subdivision (f) of Section 9615[.]"  Cal. Com. Code § 9602 (2020); see also § 679.602, Fla. Stat. (2019) (preventing waiver or variance of the rules stated in Fla. Stat. § 679.610(2)).

82.     The Defendant acted in bad faith upon the Loan Agreement by: (i) refusing to dispose of the Collateral in a commercially reasonable fashion; (ii) failing to apply proceeds from the Collateral's disposition to pay off the Plaintiffs' indebtedness to the Defendant; and (iii) failing to return to the Plaintiffs the surplus resulting from the Collateral's disposition.

83.     GW and Clayvard—which invest in companies in their ordinary course of business—suffered damages from the Defendant's bad faith upon the Loan Agreement.  If the Defendant had acted in good faith upon the Loan Agreement, it would have disposed of the Collateral upon commercially reasonable terms.  GW and Clayvard, in turn, could have: (i) invested cash proceeds from the Collateral's disposition, or (ii) sold noncash proceeds from the Collateral's disposition, and invested the money earned therefrom.  Additionally, the commercially reasonable disposition would have paid off any debts GW and Clayvard owed to the Defendant.

84.     Digi suffered damages as a result of the Defendant's bad faith upon the Loan Agreement.  If the Defendant had not acted in bad faith upon the Loan Agreement, it would have disposed of the Collateral on commercially reasonable terms, which would have paid off any debts Digi owed to the Defendant.  Additionally, Digi would have benefitted from a surplus, and would have been able to invest that surplus.  Further, the Defendant's bad faith upon the Loan Agreement made it more difficult for Digi to borrow money or raise capital, as Digi would be required to disclose indebtedness that would otherwise not exist.

85.     As previously noted, the Loan Agreement states that HCS would be responsible for "attorneys fees[ ] incurred in terminating, enforcing . . . or defending the Loan Documents[.]" Ex. A at 2.

86.     Under both Florida and California law, if "a contract contains a provision allowing attorney's fees to a party . . . required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails[.]" § 57.105(7), Fla. Stat. (2019); *see also* Cal. Civ. Code § 1717(a) (2020) (providing, *inter alia*, substantially the same relief). Given the fact that the Loan Agreement entitles the Defendant to reasonable attorneys' fees if it prevails upon an action enforcing the Loan Agreement, the Plaintiffs are entitled to reasonable attorneys' fees upon prevailing on this action against the Defendant.

WHEREFORE, the Plaintiffs respectfully pray: (i) for entry of judgment on Count V awarding the Plaintiffs Five Hundred Ten Thousand Four Hundred and 00/100 Dollars ($510,400.00), together with costs and reasonable attorneys' fees arising from this action, and postjudgment interest accruing at the statutory rate; and (ii) for such other and further relief as the Court deems just and proper.

DATED:  October 27, 2020                Respectfully submitted,

                                        **DAL LAGO LAW**

                                        By:  */s/ Mike Dal Lago, Esq.*
                                        MICHAEL R. DAL LAGO, ESQ.
                                        Florida Bar No. 0102185
                                        Email:  mike@dallagolaw.com
                                        CHRISTIAN GARRETT HAMAN, ESQ.
                                        Florida Bar No. 1017079
                                        Email:  chaman@dallagolaw.com
                                        999 Vanderbilt Beach Road
                                        Suite 200
                                        Naples, FL 34108
                                        Telephone: (239) 571-6877

*Counsel for Plaintiffs,*
*Goodwater Holdings LLC,*
*Digicare, Inc., and Clayvard Ltd*

**Exhibit Index**

| Number | Title |
|--------|-------|
| 1 | Verification of Robert E. Salveson, as Managing Member for GOODWATER HOLDINGS LLC |
| 2 | Verification of David Swart, as CEO/President for DIGICARE, INC. |
| 3 | Verification of Lawrence Deneault, as Director for CLAYVARD LTD. |
| A | Loan Agreement |
| B | Pledge Agreement |
| C | Default Notice |

# **EXHIBIT 1**

## <u>VERIFICATION</u>

Robert E. Salveson, as Managing Member for GOODWATER HOLDINGS LLC, declares and states: I am an authorized representative of Plaintiff GOODWATER HOLDINGS LLC.  Under penalties of perjury, I declare that I have read the Verified Complaint and the facts stated in it are true.

Dated:  October 15, 2020                 GOODWATER HOLDINGS LLC


By: Robert E. Salveson
Managing Member for Plaintiff
GOODWATER HOLDINGS LLC

# **EXHIBIT 2**

## **VERIFICATION**

David Swart, as CEO/President for DIGICARE, INC., declares and states: I am an authorized representative of Plaintiff DIGICARE, INC.  Under penalties of perjury, I declare that I have read the Verified Complaint and the facts stated in it are true.

Dated:  October 14, 2020              DIGICARE, INC.

<br>

_____
By: David Swart
CEO/President for Plaintiff
DIGICARE, INC.

30

# **EXHIBIT 3**

## **VERIFICATION**

Lawrence Deneault, as Director for CLAYVARD LTD., declares and states:

I am an authorized representative of Plaintiff CLAYVARD LTD.  Under penalties

of perjury, I declare that I have read the Verified Complaint and the facts stated in it

are true.

Dated:  October 14, 2020                     CLAYVARD LTD.


_____

By: Lawrence Deneault
Director for Plaintiff
CLAYVARD LTD.

# **EXHIBIT A**

**LOAN AGREEMENT**

This LOAN AGREEMENT (this "Agreement") is made and entered into as of this 26th day of July 2017 ("Effective Date"), by and between DEJ FAMILY LIMITED PARTNERSHIP, a California limited partnership ("Lender"), and HEALTH CHAIN SOLUTIONS LLC, a Florida limited liability company ("Borrower").

R E C I T A L S

WHEREAS, Borrower desires that Lender make the Loan (as defined below) to Borrower, and Lender is willing to make the Loan to Borrower, on the terms set forth herein and the related Loan Documents (as defined below).

NOW, THEREFORE, in consideration of the terms and conditions contained herein, and of any extensions of credit heretofore, now or hereafter made by Lender, the parties hereto agree as follows:

A G R E E M E N T

In consideration of the mutual promises and covenants set forth herein, the parties, intending to be legally bound, hereby agree as follows:

*1.      **Definitions and Principles of Construction.*   As used in this Agreement, the following terms have the following meanings:

"Agreement" means this Loan Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Bankruptcy Code" means the United States Bankruptcy Code, as in effect from time to time.

"Business Day" means any day other than a Saturday, a Sunday or a day on which commercial banks located in New York are authorized or required by law or other governmental action to close.

"Change in Control" shall means (A) the merger, consolidation or other reorganization of Borrower, with or into one or more entities, as a result of which the outstanding shares of Borrower immediately prior to such merger or consolidation are, or are to be, converted (x) solely into cash or non-voting securities of the surviving or resulting entity, or (y) at least in part into voting securities of the surviving or resulting entity, but such voting securities will represent less than 50% of the outstanding voting securities of the surviving or resulting entity; (B) any sale, lease, exchange or other transfer (in one transaction or a series of related transactions) of all, or substantially all, of the assets of Borrower to a person that was not a member thereof on the Effective Date; or (C) a person or entity who is not a member of Borrower or an affiliate thereof as of the Effective Date acquires directly or indirectly 50% or more of Borrower's outstanding voting securities.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of notice, the lapse of time, or any other condition, would, unless cured or waived, become an Event of Default.

"<u>Event of Default</u>" means any of the events specified in Section 8.1, provided that any requirement for the giving of notice, the lapse of time, or any other condition has been satisfied.

"<u>GAAP</u>" means generally accepted accounting principles as of the date of determination, consistently applied.

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator.

"<u>Indebtedness</u>" means as to any Person, at a particular time, all items that constitute, without duplication, (i) indebtedness for borrowed money or the deferred purchase price of Property, (ii) indebtedness evidenced by notes, bonds, debentures or similar instruments, (iii) obligations with respect to any conditional sale or title retention agreement, (iv) indebtedness arising under acceptance facilities and the amount available to be drawn under all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder to the extent such Person shall not have reimbursed the issuer in respect of the issuer's payment of such drafts, (v) all liabilities secured by any Lien on any Property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, and (vi) the principal portion of obligations under capital lease obligations.  The term "Indebtedness" is not intended to prohibit the Borrower from incurring ordinary trade debt during the ordinary course of its business.  Any use of the "Indebtedness" in this Agreement shall be deemed to specifically exclude such ordinary trade debt.

"<u>Lender Expenses</u>" means all (i) costs or expenses required to be paid by Borrower under any of the Loan Documents that are paid or incurred by Lender, (ii) fees or charges (including attorneys fees) paid or incurred by Lender in connection with Lender's transactions with Borrower, including, without limitation, Lender's reasonable fees and expenses incurred in drafting, reviewing, administering or amending the Loan Documents, (iii) costs and expenses incurred by Lender in the disbursement of funds to Borrower (by wire transfer or otherwise), (iv) reasonable costs and expenses paid or incurred by Lender to correct any default or enforce any provision of the Loan Documents, (v) reasonable costs and expenses of third party claims or any other suit paid or incurred by Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents, and (vi) Lender's reasonable fees and expenses (including attorneys fees) incurred in terminating, enforcing (including attorneys fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning Borrower or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit or preferential arrangement, encumbrance, lien (statutory or other), or other security agreement or

security interest of any kind or nature whatsoever, including, without limitation, any conditional sale or other title retention agreement and any capital or financing lease having substantially the same economic effect as any of the foregoing.

"Loan Documents" means collectively, this Agreement, the Note, the Warrant and the Pledge Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the net worth of Borrower, or (ii) the ability of Borrower to perform its obligations under the Loan Documents.

"Maturity Date" means the earliest to occur of (i) the two-year anniversary of the Effective Date, (ii) a Change in Control, or (iii) an Event of Default after the expiration of all applicable cure periods.

"New Securities" means, collectively, equity securities of Borrower, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities.

"Obligations" means the aggregate principal amount of the Loan, all accrued and unpaid interest thereon (including any interest that, but for the provisions of the Bankruptcy Code, would have accrued) and the Full Interest Amount (as defined below).

"Person" means any individual, firm, partnership, joint venture, corporation, limited liability company or partnership, association, business enterprise, unincorporated association, trust, Governmental Authority or any other entity.

"Property" means all types of real, personal, tangible, intangible or mixed property.

"Tax" means any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature and whatever called, by a Governmental Authority, imposed, levied, collected, withheld or assessed.

## 2.    Amount and Term of Loan; Warrant.

**2.1    Loan**.  Subject to and upon the terms and conditions hereof, Lender shall make a loan to Borrower within five Business Days of the satisfaction of all of the conditions set forth in Section 4 in an aggregate principal amount of $125,000 (the "Loan"), which shall be payable as follows: (i) $116,675 shall be paid by check payable to Borrower or by wire transfer to a bank account designated by Borrower, and (ii) $8,325 shall be paid by Lender to Pivotal Law Firm, Inc. on behalf of Borrower pursuant to Section 10.3 hereof. The Loan shall be evidenced by a promissory note of Borrower, in the form of Exhibit A attached hereto (the "Note").  Borrower's Obligations under the Note shall be secured by certain equity interests of NeoCrumb, LLC, a Florida limited liability company, owned by Lawrence Deneault (through his entity Clayvard Ltd.) and Robert Salveson (through his entity Goodwater Holdings LLC) (collectively, the "Secured

Membership Interests"), on the terms and subject to the conditions of the Pledge Agreement, in substantially the form of Exhibit B attached hereto (the "Pledge Agreement").

**2.2    Interest Rate**.  The Loan shall bear interest on the outstanding principal balance thereof at any time outstanding at a rate equal to 16% per annum.  Interest shall be calculated on the basis of a year of 365 days and the actual days elapsed (including the first day but excluding the last day).

**2.3    Payment of Interest on Loan**.  Subject to Section 2.4, all accrued and unpaid interest on the outstanding principal amount of the Loan shall be paid monthly, in arrears, commencing on the one-month anniversary of the Effective Date, and continuing on the same calendar day of each consecutive month thereafter until the Maturity Date, when all accrued but unpaid interest is due and payable in full. Notwithstanding the foregoing, if the Loan becomes due and payable prior to the Maturity Date due to a Default or an Event of Default, all accrued and unpaid interest shall also become due and payable. The full amount of the interest that is accruable on the outstanding principal balance of the Loan totaling $40,000 *less* any monthly interest payment actually paid to Lender is hereinafter referred to as the "Full Interest Amount."

**2.4    Payments and Prepayment of Loan**.  The unpaid principal amount of the Loan shall be paid on or before the Maturity Date.  Borrower may prepay the Loan at any time prior to the Maturity Date, provided that Borrower also pays the Full Interest Amount on the date of such prepayment. The parties acknowledge and agree that the payment of the Full Interest Amount in the event of a prepayment under this Section 2.4 is intended to compensate Lender for all amounts that would be payable to Lender hereunder as if the Note had not been prepaid.

**2.5    Application of Usury Laws.**  The parties agree that the Loan is made in Florida. It is the intention of the parties to conform strictly to applicable usury laws and, anything herein or elsewhere to the contrary notwithstanding, Borrower's liabilities, obligations and indebtedness from time to time owing to Lender shall be subject to the limitation that Borrower shall not be required to pay, and Lender shall not be entitled to charge or receive, any interest to the extent that such interest exceeds the maximum rate of interest which Lender is permitted by applicable law to contract for, charge or receive and which would not give rise to any claim or defense of usury. If, as a result of any circumstances whatsoever, performance of any provision hereof shall, at the time performance of such provision is due, violate applicable usury law, then, ipso facto, the obligation to be performed shall be reduced to the highest lawful rate, and if, from any such circumstance, Lender shall ever receive interest or anything which might be deemed interest under applicable law which would exceed the highest lawful rate, the amount of such excess interest shall be applied to the reduction of the principal amount owing on account of the Note or the amounts owing on other liabilities, obligations and indebtedness of Borrower from time to time owing to Lender and not to the payment of interest, or if such excessive interest exceeds the unpaid principal balance of the Obligations, such excess shall be refunded to Borrower.

**2.7    Warrant.**  Contemporaneously herewith, as an inducement to enter into this Agreement, Lender shall receive a warrant from Borrower (the "Warrant") that provides the right for Lender to purchase 31,646 of Borrower's Membership Interests (as defined in that certain

Limited Liability Company Agreement of Lender dated as of December 1, 2014, by and among Lender and its members, as amended). Subject to the adjustments set forth in the Warrant, the exercise price shall equal $3.95 per Membership Interest.  The Warrant shall be exercisable through the date that is the five-year anniversary of the Effective Date, and shall be in substantially the form attached hereto as Exhibit C.

       **3.**     **Representations and Warranties.**    Borrower represents and warrants to Lender that the following statements are true and complete and not misleading:

       **3.1**     **Authorization**.  Borrower has the requisite legal right and capacity to enter into this Agreement and each of the other Loan Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

       **3.2**     **Due Execution and Delivery; Binding Obligations**.  This Agreement and each of the other Loan Documents has been duly executed and delivered by Borrower, to the extent it is a party hereto and thereto.  This Agreement and each of the other Loan Documents constitute the legal, valid and binding agreements and obligations of Borrower, to the extent it is a party hereto and thereto, enforceable against it in accordance with their respective terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or conveyance or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability and except as rights of indemnity or contribution may be limited by federal or state securities or other laws or the public policy underlying such laws.

       **3.3**     **No Conflict or Violation**.  Neither the execution and delivery of this Agreement or any of the other Loan Documents to which Borrower is a party, nor its consummation of the transactions contemplated hereby or thereby, nor the fulfillment of, or compliance with the terms and conditions of any of the foregoing, will result in (a) a material breach of, or a material default (or an event which, with notice or lapse of time or both would constitute a material default) under or result in the termination of, or accelerate the performance required by, or create a right of termination or acceleration under, any material agreement to which it is a party or by which it is bound or to which any of its assets is subject, except where such breach, default, failure to give notice, termination or Lien would not have a Material Adverse Effect, (b) a violation of any law, order, judgment, writ, injunction, decree or award to which it is a party or by which it is bound or to which any of its assets is subject.

       **3.4**     **Consents and Approvals**.  No consent, permit, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority, or to Borrower's knowledge, any other Person, is required to be obtained or made by Borrower in connection with its execution, delivery and performance of this Agreement and any of the other Loan Documents to which it is a party or the consummation of the transactions contemplated hereby or thereby in accordance with the provisions hereof and thereof, except where the failure to give notice, to file, or to obtain any authorization, consent, or approval would not have a Material Adverse Effect.

       **3.5**    *No Other Indebtedness*.  As of the Effective Date, other than the Loan hereunder, Borrower has no outstanding Indebtedness or other similar obligations, except trade debt that was incurred in the ordinary course of business.

    **4.**    *Conditions to Effectiveness of Agreement*.  The effectiveness of this Agreement shall be subject to the fulfillment of the following conditions precedent:

       **4.1**    *Accuracy of Representations and Warranties*.  All representations and warranties of Borrower contained in this Agreement or in any document delivered pursuant hereto shall be true and correct in all material respects as of the Effective Date.

       **4.2**    *Borrower's Performance of Covenants*.  All covenants, agreements and obligations required by the terms of this Agreement to be performed, satisfied or complied with by Borrower at or before the Effective Date shall have been duly and properly performed in all material respects.

       **4.3**    *Consents and Regulatory Approvals*.  All licenses, permits, authorizations, consents and approvals of and filings with any governmental or regulatory agency or any other third party required to be obtained or made in connection with the consummation of the transactions contemplated by this Agreement shall have been duly obtained or made by or on behalf of Borrower.

       **4.4**    *Note*.  Lender shall have received the Note, duly executed by Borrower.

       **4.5**    *Pledge Agreement*.  Lender shall have received the Pledge Agreement, together with proper financing statements and other documents as shall be necessary to perfect the security interests created by the Pledge Agreement, duly executed by an authorized signatory of each of Clayvard Ltd. and Goodwater Holdings LLC.

       **4.6**    *Warrant*.  Lender shall have received the Warrant, duly executed by Borrower.

    **5.**    *Affirmative Covenants*.  Borrower agrees that, so long as the Loan remains outstanding and unpaid, Borrower shall be subject to the following affirmative covenants:

       **5.1**    *Certificates; Other Information*.  Furnish to Lender:

       (a)    Prompt written notice if (i) there shall occur and be continuing a Default or an Event of Default or (ii) any other Indebtedness of Borrower is declared or shall become due and payable prior to its stated maturity, or is called and not paid when due; and

       (b)    Prompt written notice of any citation, summons, subpoena, order to show cause or other document naming Borrower a party to any litigation or other proceeding that, if determined adversely to Borrower, could have a Material Adverse Effect, or that expressly calls into question the validity or enforceability of any of the Loan Documents.

      **5.2**    ***Taxes***.   Pay and discharge when due all Taxes, assessments and governmental charges, license fees and levies upon, or with respect to Borrower and all Taxes upon the income, profits and Property of Borrower, that, if unpaid, would have a Material Adverse Effect or become a Lien on the Property of Borrower.

      **5.3**    ***Payment of Indebtedness and Performance of Obligations***.  Pay and discharge when due all lawful Indebtedness, obligations and claims for labor, materials and supplies or otherwise that, if unpaid, could have a Material Adverse Effect or become a Lien upon Property of Borrower.

      **5.4**    ***Observance of Legal Requirements***.  Observe and comply in all respects with all laws, ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions and requirements of all Governmental Authorities, that now or at any time hereafter may be applicable to it.

      **6.**    ***Negative Covenants***.  Borrower agrees that, so long as the Loan is outstanding and unpaid, Borrower shall not, directly or indirectly, without the prior written consent of Lender, which may be withheld in Lender's sole and absolute discretion:

      **6.1**    ***Indebtedness***.  After the Effective Date, create, incur, assume or allow to come into existence any liability for Indebtedness, except Indebtedness due under the Loan Documents, and any trade debt that becomes due in the Borrower's ordinary course of business.

      **6.2**    ***Liens***.  After the Effective Date, create, incur, assume or allow to come into existence any Lien upon any of its Property, whether now owned or hereafter acquired, or enter into any agreement, other than this Agreement and other obligations expressly permitted by this Agreement which prohibits or limits the ability of Borrower to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired.

      **6.3**    ***Investments, Loans, Etc***.  Purchase or otherwise acquire, hold or invest in the equity of, or any other interest in, any Person, or make any loan or advance to, or enter into any arrangement for the purpose of providing funds or credit to, or make any other investment, whether by way of capital contribution, time deposit or otherwise, in or with any Person, except: (i) investments in short-term domestic time deposits with any commercial bank, trust company or national banking association; (ii) investments in short-term direct obligations of the United States or agencies thereof whose obligations are guaranteed by the United States; and (iii) normal business banking accounts and short-term certificates of deposit and time deposits in, or issued by, federally insured institutions in amounts not exceeding the limits of such insurance; provided, however, the foregoing insurance limitation will not apply if the federally insured institution is investment grade rated.

      **7.**    ***Rights to Future Stock Issuances***.  Subject to the terms and conditions of this Section 7 and applicable securities laws, if Borrower proposes to offer or sell any New Securities (each, a "Future Financing"), Borrower shall offer such New Securities to Lender. The price per New Security sold to Lender in any Future Financing shall equal the product obtained by multiplying 80% by the lowest price per New Security sold or issued to any investor in the Future

Financing.  Borrower shall give notice (the "Offer Notice") to Lender, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.  By notification to Borrower within 20 days after the Offer Notice is given, Lender may elect to purchase or otherwise acquire, at the price (subject to the discount provided for herein) and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals a total investment amount of $2,000,000.  The closing of any sale pursuant to this Section 7 shall occur within the later of 90 days of the date that the Offer Notice is given and the date of initial sale of New Securities pursuant to Section 7.  If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired by Lender, Borrower may, during the 90-day period following the expiration of the periods provided in this Section 7, offer and sell the remaining unsubscribed portion of such New Securities to any Person at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice.  If Borrower does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within 30 days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to Lender in accordance with this Section 7. The covenants set forth in this Section 7 shall terminate and be of no further force or effect on the date that is the earlier of (i) the five-year anniversary of the Effective Date, or (ii) the date that Lender has invested an amount in excess of $2,000,000 in one or a series of Future Financings pursuant to this Section 7.

### 8.  *Default*.

**8.1   *Events of Default*.**  The following shall each constitute an "Event of Default" hereunder:

(a)   The failure of Borrower to pay any installment of principal or interest on the Loan;

(b)   The failure to observe or perform any material term, covenant or agreement contained in any Loan Document and such failure shall have continued unremedied for a period of 30 days after Borrower receives written notice from Lender specifying such failure;

(c)   Any representation or warranty made in any Loan Document or in any certificate, report, opinion (other than an opinion of counsel) or other document delivered or to be delivered pursuant thereto, shall prove to have been incorrect or misleading (whether because of misstatement or omission) in any material respect when made;

(d)   Borrower shall (i) make a general assignment for the benefit of creditors; (ii) generally not be paying its debts as such debts become due, (iii) admit in writing its inability to pay its debts as they become due, (iv) file a voluntary petition in bankruptcy, (v) file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment of debt, liquidation or dissolution or similar relief under any present or future statute, law or regulation of any jurisdiction, (vi) petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of its Property, (vii) be the subject of any such proceeding filed against it that remains undismissed for a period of 90 days, (viii) file any answer

admitting or not contesting the material allegations of any such petition filed against it or any order, judgment or decree approving such petition in any such proceeding, (ix) seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, sequestrator, custodian, liquidator, or fiscal agent for it, or any substantial part of its Property, or an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for 90 days, or (x) take any formal action for the purpose of effecting any of the foregoing;

(e)     An order for relief is entered under the Bankruptcy Code or any other decree or order is entered by a court having jurisdiction (i) adjudging Borrower bankrupt or insolvent, (ii) approving as properly filed a petition seeking reorganization, liquidation, arrangement, adjustment or composition of or in respect of Borrower under the United States bankruptcy laws or any other applicable Federal or state law, (iii) appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of Borrower or of any substantial part of the Property thereof, or (iv) ordering the liquidation of the affairs of Borrower, and any such decree or order continues unstayed and in effect for a period of 90 days;

(f)     Judgments or decrees against Borrower aggregating in excess of $50,000 on a consolidated basis shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 30 days;

(g)     Any Loan Document shall cease, for any reason, to be in full force and effect, or Borrower shall so assert in writing or shall disavow any of its obligations thereunder;

(h)     Any default or event of default shall occur and be continuing under any other material agreement to which Borrower is a party; or

(i)     The assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Secured Membership Interests, without the prior written consent of the Lender.

*8.2     Remedies Upon Events of Default*.  Upon the occurrence of an Event of Default or at any time thereafter during the continuance thereof, (a) if such event is an Event of Default specified in clause (d) or (e) of Section 8.1, the Loan, and all accrued and unpaid interest thereon (including the Full Interest Amount), and all other amounts owing under the Loan Documents shall immediately become due and payable, and Lender may exercise any and all remedies and other rights provided in the Loan Documents, and (b) if such event is any other Event of Default, Lender may, by notice of default to Borrower, declare the Loan, and all accrued and unpaid interest thereon (including the Full Interest Amount) and all other amounts owing under the Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable, and Lender may exercise any and all remedies and other rights provided pursuant to the Loan Documents.  Except as otherwise provided in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.  To the extent permitted by applicable law, Borrower hereby further expressly waives and covenants not to assert any appraisement, valuation, stay, extension, redemption or similar laws, now or at any time

9

hereafter in force that might delay, prevent or otherwise impede the performance or enforcement of any Loan Document.

        **8.3**    ***Application and Reversal of Payments***. In the event that the Loan has been declared due and payable pursuant to the provisions of this Section, any funds received by Lender from or on behalf of Borrower shall be applied by Lender in payment of the Loan, and the obligations of Borrower under the Loan Documents in the following manner and order: (i) first, to the payment of any Lender Expenses; (ii) second, to the accrued but unpaid interest on the Loan (including the Full Interest Amount); (iii) third, to the outstanding principal amount of the Loan; and (iv) fourth, to the payment of any other amounts owing to Lender under any Loan Document.

        **8.4**    ***Adjustments; Set-off***.  In addition to any rights and remedies of Lender provided by law, upon the occurrence of an Event of Default and the acceleration of the obligations owing in connection with the Loan Documents, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent not prohibited by applicable law, to set-off and apply against any indebtedness, whether matured or unmatured, of Borrower to Lender or to any of Lender's affiliates, any amount owing from Lender, or any of Lender's affiliates, to Borrower, at, or at any time after, the happening of any of the above-mentioned events.  To the extent not prohibited by applicable law, the aforesaid right of set-off may be exercised by Lender, or any such affiliate of Lender, against Borrower or against any trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower or such trustee in bankruptcy, custodian, debtor in possession, assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off shall not have been exercised by Lender prior to the making, filing or issuance, or service upon Lender of, or of notice of, any such petition, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena, order or warrant.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender or any of Lender's affiliates, provided that the failure to give such notice shall not affect the validity of such set-off and application.

        **9.**    ***Subordination Provisions.*** Borrower hereby covenants and agrees that the payment of the Principal Amount of, and accrued interest and fees on, this Note shall be senior to all other Indebtedness of Borrower.

        **10.**    ***Other Provisions***.

        **10.1**    ***Amendments and Waivers***.  This Agreement may be amended and any provision hereof waived only with the written consent of Lender and Borrower.

        **10.2**    ***Notices***.  All notices, requests and demands to or upon the respective parties to the Loan Documents to be effective shall be in writing and, unless otherwise expressly provided

therein, shall be delivered by hand, sent by facsimile, or sent by United States mail, first-class postage prepaid, addressed as follows:

|  |  |
|---|---|
| Lender: | DEJ Family Limited Partnership |
|  | 5155 Via Del Acero |
|  | Yorba Linda, CA 92887 |
|  | Attention: Dan Johnson |
| with a copy to: | Pivotal Law Firm, Inc. |
|  | 25 Mauchly, Suite 319 |
|  | Irvine, CA 92618 |
|  | Attention:  Adam Miller |
| Borrower: | Health Chain Solutions LLC |
|  | 3520 Mullens Way |
|  | Cincinnati, OH 45245 |
|  | Attention: President |

Notices, requests or demands hereunder shall be deemed given (i) three Business Days after being deposited in the U.S. mail, postage prepaid, if sent by U.S. mail, (ii) upon confirmation of transmission, if sent by facsimile, (iii) when delivered, if delivered in person, (iv) when delivered, if sent by overnight courier service, and (v) upon confirmation of delivery when sent by e-mail. Any party to a Loan Document may rely on signatures of the parties thereto that are transmitted by fax or other electronic means as fully as if originally signed.

**10.3     Expenses**.  Borrower shall bear its own expenses in connection with the preparation and negotiation of this Agreement and the other Loan Documents. Borrower shall pay all legal and administrative costs of Lender related to the Loan, including, without limitation, the fees and expenses of Pivotal Law Firm, Inc., the legal counsel for Lender. Borrower shall also be responsible for all Lender Expenses, if applicable.

**10.4     No Waiver; Cumulative Remedies**.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges under the Loan Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**10.5     Survival of Representations and Warranties**.  All representations and warranties made under the Loan Documents and in any document, certificate or statement delivered pursuant thereto or in connection therewith shall survive the execution and delivery of the Loan Documents.

**10.6     Counterparts**.  Each Loan Document (other than the Note) may be executed by one or more of the parties thereto on any number of separate counterparts and all of said

11

counterparts taken together shall be deemed to constitute one and the same document.  It shall not be necessary in making proof of any Loan Document to produce or account for more than one counterpart signed by the party to be charged.  A counterpart of any Loan Document or to any document evidencing, and of any an amendment, modification, consent or waiver to or of any Loan Document transmitted by facsimile shall be deemed to be an originally executed counterpart.

   **10.7** ***Headings Descriptive***.  Section headings have been inserted in the Loan Documents for convenience only and shall not be construed to be a part thereof.

   **10.8** ***Severability***.  Every provision of the Loan Documents is intended to be severable, and if any term or provision thereof shall be invalid, illegal or unenforceable for any reason, the validity, legality and enforceability of the remaining provisions thereof shall not be affected or impaired thereby, and any invalidity, illegality or unenforceability in any jurisdiction shall not affect the validity, legality or enforceability of any such term or provision in any other jurisdiction.

   **10.9** ***Integration***.  All exhibits to a Loan Document shall be deemed to be a part thereof.  The Loan Documents embody the entire agreement and understanding between Borrower and Lender, with respect to the subject matter thereof and supersede all prior agreements and understandings between them with respect to the subject matter hereof and thereof.

   **10.10** ***Governing Law***.  The Loan Documents and the rights and obligations of the parties thereunder shall be governed by, and construed and interpreted in accordance with, the internal laws of the State of Florida, without regard to principles of conflict of laws.

   **10.11** ***Assignment***.  The Loan Documents and the rights and obligations of the parties thereunder shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Borrower may not assign this Agreement or any of the other Loan Documents, or assign the rights or delegate the duties hereunder or thereunder, without the prior written consent of Lender.

*[ Signature Page Follows ]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the day and year first above written.

**"LENDER":**                                    **"BORROWER":**

**DEJ FAMILY LIMITED PARTNERSHIP**              **HEALTH CHAIN SOLUTIONS LLC**

By: _Daniel E. Johnson_                          By:_____
Name: _DANIEL E. JOHNSON_                         Name:_____
Title: _GENERAL PARTNER_                          Title:_____

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized representatives as of the day and year first above written.

**"LENDER"**:                                    **"BORROWER":**

**DEJ FAMILY LIMITED PARTNERSHIP**       **HEALTH CHAIN SOLUTIONS LLC**

By:_____       By: _____
Name:_____       Name: David Swart
Title:_____       Title: President & CEO

**EXHIBIT A**

**FORM OF NOTE**

*See Attached.*

**EXHIBIT B**

**FORM OF PLEDGE AGREEMENT**

*See Attached.*

**EXHIBIT C**

**FORM OF WARRANT**

*See Attached.*

*Exhibit C*
*Page 1 of 1*

# **EXHIBIT B**

# PLEDGE AGREEMENT

This PLEDGE AGREEMENT (this "Agreement") is made and entered into as of this 26th day of July 2017, by and among DEJ FAMILY LIMITED PARTNERSHIP, a California limited partnership ("Lender"), HEALTH CHAIN SOLUTIONS LLC, a Florida limited liability company ("Borrower"), GOODWATER HOLDINGS LLC, a Florida limited liability company ("Goodwater"), and CLAYVARD LTD., a company registered in the British Virgin Islands ("Clayvard"). Goodwater and Clayvard are hereinafter each referred to individually as "Pledgor" and collectively as "Pledgors").

## R E C I T A L S

A.     Lender has entered into that certain Loan Agreement (as amended from time to time, the "Loan Agreement"), dated of even date herewith, pursuant to which Lender has agreed to make a loan to Borrower (the "Loan").

B.     In connection with the making of the Loan under the Loan Agreement and as security for the payment and performance of Borrower's obligations under the Loan Agreement, Lender is requiring, among other things, that Pledgors execute and deliver this Pledge Agreement and grant the security interest contemplated hereby.

## A G R E E M E N T

In consideration of the promises and the covenants hereinafter contained, and in order to induce Lender to make the Loan under the Loan Agreement, the parties, intending to be legally bound, agree as follows:

1.     Definitions.  All capitalized terms used herein but which are not otherwise defined shall have the meanings given to them in the Loan Agreement.

2.     Pledge.

(a)     Goodwater hereby pledges to Lender and grants to Lender a security interest in and to all of the following (collectively, the "Goodwater Pledged Collateral"): (a) 25,000 Membership Units (as defined in that certain Amended and Restated Operating Agreement dated as of April 2016, by and among NeoCrumb, LLC, a Florida limited liability company ("NeoCrumb") and its members (as amended, the "LLC Agreement")) of NeoCrumb (the "Goodwater Pledged Securities"), and the certificates and other instruments representing or evidencing the Goodwater Pledged Securities, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Goodwater Pledged Securities; (b) all rights and privileges of Goodwater with respect to the securities and other property referred to in clause (a), above; and (c) all proceeds of any of the foregoing.

(b)     Clayvard hereby pledges to Lender and grants to Lender a security interest in and to all of the following (collectively, the "Clayvard Pledged Collateral" and, together with the Goodwater Pledged Collateral, the "Pledged Collateral"): (a) 25,000 Membership Units of

NeoCrumb (the "Clayvard Pledged Securities" and, together with the Goodwater Pledged Securities, the "Pledged Securities"), and the certificates and other instruments representing or evidencing the Clayvard Pledged Securities, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Clayvard Pledged Securities; (b) all rights and privileges of Clayvard with respect to the securities and other property referred to in clause (a), above; and (c) all proceeds of any of the foregoing.

        3.      Security for Obligations.  This Agreement secures, and the Pledged Collateral is security for, the prompt payment and performance of all obligations of Borrower under the Loan Agreement, and all obligations of Borrower now or hereafter existing under this Agreement or any other Loan Document, including, without limitation, all costs and expenses of Lender in connection with preserving, defending or enforcing the Pledged Collateral or the security interest granted hereunder and all other costs and expenses of Lender incurred in connection with this Agreement, all whether due or to become due, matured or unmatured, liquidated or unliquidated, or contingent or noncontingent, including obligations of performance as well as obligations of payment, and including interest that accrues after the commencement of any bankruptcy or insolvency proceeding by or against Borrower or any Pledgor (collectively, the "Secured Obligations").

        4.      Delivery of Pledged Collateral.  All instruments representing or evidencing the Pledged Securities shall be delivered to and held by or on behalf of Lender pursuant hereto and shall be accompanied by duly executed instruments of transfer or assignment in blank, including duly executed blank stock powers, all in form and substance satisfactory to Lender.  Lender shall have the right, at any time after the occurrence of a Default or Event of Default, in its discretion and without notice to Pledgor, to transfer to or to register in the name of Lender, or any of its nominees, subject to the terms of this Agreement, any or all of the Pledged Securities.

        5.      Representations and Warranties.  Pledgor represents and warrants to Lender as follows:

        (a)      Pledgor is, and at the time of delivery of the Pledged Securities to Lender pursuant to Section 4 hereof will be, the sole holder of record and the sole beneficial owner of such Pledgor's Pledged Collateral free and clear of any Lien thereon or affecting the title thereto except for the Lien created by this Agreement.

        (b)      All of the Pledged Securities have been duly authorized, validly issued and are fully paid and non-assessable; and there are no existing options, warrants or commitments of any kind or nature or any outstanding securities or other instruments convertible into any membership interests of Lender, and no membership interests of Lender are held in the treasury of such company.

        (c)      Pledgor has the right and requisite authority to pledge, assign, transfer, deliver, deposit and set over such Pledgor's Pledged Collateral to Lender, as provided herein.

        (d)      None of the Pledged Securities has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such

2

issuance or transfer may be subject.  Pledgor's execution, delivery and performance of this Agreement and the pledge of such Pledgor's Pledged Collateral hereunder do not, directly or indirectly, violate or result in a violation of any such laws.

(e)     Pledgor's execution, delivery and performance of this Agreement and the pledge of such Pledgor's Pledged Collateral hereunder does not violate the LLC Agreement.

(f)     None of the Pledged Securities included in the Pledged Collateral is, as of the date of this Agreement, margin stock and Pledgor shall, promptly after learning thereof, notify Lender of any of the Pledged Collateral which is or becomes margin stock and execute and deliver in favor of Lender any and all instruments, documents and agreements (including, but not limited to Forms U-1) necessary to cause the pledge of such margin stock to comply with all applicable laws, rules and regulations.

(g)     No consent, approval, authorization or other order of any individual, corporation, limited liability company, partnership, trust, unincorporated organization, association or other entity ("Person") and no consent, authorization, approval, or other action by, and no notice to or filing with, any Governmental Authorities, domestic or foreign, is required to be made or obtained by Pledgor either (i) for the pledge of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor or (ii) for the exercise by Lender of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(h)     The pledge, assignment and delivery of the Pledged Collateral pursuant to this Agreement will create a valid Lien on and a perfected security interest in the Pledged Collateral pledged by Pledgor, and the proceeds thereof, securing the payment and performance of the Secured Obligations, subject to no other Lien or security interest.

(i)     This Agreement has been duly authorized, executed and delivered by Pledgor and constitutes the legal, valid and binding obligation of Pledgor enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

The representations and warranties set forth in this Section 5 shall survive the execution and delivery of this Agreement.

6.     Covenants.  Pledgor covenants and agrees that until the payment and performance in full of the Secured Obligations:

(a)     Pledgor will not sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to any Pledged Collateral or any unpaid dividends or other distributions or payments with respect thereto or grant a Lien on any thereof.

(b)     Pledgor will, at its expense, promptly execute, acknowledge and deliver all such instruments and take all such action as Lender from time to time may reasonably request in order to ensure to Lender the benefits of the Liens in and to the Pledged Collateral intended to be

created by this Agreement, including the filing of any necessary financing statements, which may be filed by Lender without the signature of Pledgor, and will cooperate with Lender, at Pledgor's expense, in obtaining all necessary approvals and making all necessary filings under federal or state law in connection with such Liens or any sale or transfer of any Pledged Collateral.

(c)     Pledgor has and will defend the title to its Pledged Collateral and the Liens of Lender, thereon against the claim of any Person, and will maintain and preserve such Liens until the payment and performance in full of the Secured Obligations.

7.     Pledgor's Rights. As long as no Event of Default shall have occurred and be continuing and until written notice shall be given to Pledgor in accordance with Section 8 hereof.

(a)     Pledgor shall have the right, from time to time, to vote and give consents with respect to the Pledged Collateral or any part thereof for all purposes not inconsistent with the provisions of this Agreement, the Loan Agreement and any other agreement;

(b)     Except as otherwise provided in the Loan Agreement, Pledgor shall be entitled, from time to time, to collect and receive for its own use and shall not be required to pledge pursuant to Section 2, all cash dividends paid in respect of the Pledged Securities to the extent not in violation of the Loan Agreement other than any and all (i) dividends paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral, (ii) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution, and (iii) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Collateral; provided, however, that until actually paid all rights to such distributions shall remain subject to the Lien created by this Agreement; and

(c)     all dividends (other than such cash dividends as are permitted to be paid to Pledgor in accordance with clause (ii) of Section 7(b) above), interest and principal paid on, and all other distributions in respect of any of the Pledged Securities, whenever paid or made, shall be delivered to Lender to hold as Pledged Collateral and shall, if recovered by Pledgor, be received in trust for the benefit of Lender, be segregated from the other property or funds of Pledgor, and be forthwith delivered to Lender as Pledged Collateral in the same form as so received (with any necessary endorsement).

8.     Defaults and Remedies.  Upon the occurrence and during the continuation of an Event of Default (and such Event of Default shall have continued unremedied for a period of 90 days after Borrower and Pledgor receives written notice from Lender specifying such failure), then or at any time after such declaration and following written notice to Pledgor, Lender (personally or through an agent) is hereby authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged Securities for certificates or instruments of smaller or larger denominations, to exercise the voting rights with respect thereto, to collect and receive all cash dividends and other distributions made thereon, to sell in one or more sales after ten (10) days' notice of the time and place of any public sale or of the time after which a private sale is to take place (which notice Pledgors agree is commercially reasonable), but without any previous notice or advertisement, the whole or any part of the Pledged Collateral and to otherwise

4

act with respect to the Pledged Collateral as though Lender was the out-right owner thereof; provided, however, Lender shall not have any duty to exercise any such right of sale or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so.  Any sale shall be made at a public or private sale at Lender's place of business, or at any public building to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Lender may reasonably deem fair, and Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of Pledgor or any right of redemption.  Each sale shall be made to the highest bidder, but Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate.  Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer or agent of Lender.

(a)    If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Obligations, or if the Pledged Collateral be offered for sale in lots, if at any of such sales, the highest bid for the lot offered for sale would indicate to Lender, in its discretion, the unlikelihood of the proceeds of the sales of the whole of the Pledged Collateral being sufficient to discharge all the Secured Obligations, Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided, however, that any sale or sales made after such postponement shall be after ten (10) days' notice to Pledgor.

(b)    In the event of any sales hereunder, Lender shall, after deducting all costs or expenses of every kind (including reasonable attorneys' fees and disbursements) for care, safekeeping, collection, sale, delivery or otherwise, apply the residue of the proceeds of the sales to the payment or reduction, either in whole or in part, for the benefit of Lender, of the Secured Obligations at Lender's sole discretion.

(c)    In the event that it becomes necessary to comply with any federal or state law or regulation or to make or file any registration thereunder in order for Lender to exercise any of Lender's rights hereunder, Pledgor expressly agrees to do or cause to be done all acts and prepare and execute all documents necessary to effect such compliance or registration, and to bear all reasonable costs in connection therewith.  Pledgor agrees to indemnify and to hold Lender harmless from and against any claim or liability caused by (i) any omission or alleged omission to state a material fact required to be stated, or necessary to make the statements, in light of the circumstances in which they are made, not misleading (as required in any registration or prospectus) (except that the indemnification provided for herein shall not apply to any claim or liability based upon or arising out of information furnished by Lender) or (ii) a failure to register or comply with any such law or regulation.

(d)    If, at any time when Lender shall determine to exercise its right to sell the whole or any part of the Pledged Collateral hereunder, such Pledged Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act of 1933, as amended (the "Act"), Lender may, in its discretion (subject only to applicable requirements of law), sell such Pledged Collateral or part thereof by private sale in such manner

and under such circumstances as Lender may deem necessary or advisable, but subject to the other requirements of this Section 8, and shall not be required to effect such registration or to cause the same to be effected.  Without limiting the generality of the foregoing, in any such event Lender in its discretion (i) may, in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or part thereof could be or shall have been filed under said Act (or similar statute), (ii) may approach and negotiate with a single possible purchaser to effect such sale, and (iii) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment and not with a view to the distribution or sale of such Pledged Collateral or part thereof.  In addition to a private sale as provided above in this Section 8, if any of the Pledged Collateral shall not be freely distributable to the public without registration under the Act (or similar statute) at the time of any proposed sale pursuant to this Section 8, then Lender shall not be required to effect such registration or cause the same to be effected but, in its discretion (subject only to applicable requirements of law), may require that any sale hereunder (including a sale at auction) be conducted subject to restrictions (i) as to the financial sophistication and ability of any Person permitted to bid or purchase at any such sale, (ii) as to the content of legends to be placed upon any certificates representing the Pledged Collateral sold in such sale, including restrictions on future transfer thereof, (iii) as to the representations required to be made by each Person bidding or purchasing at such sale relating to that Person's access to financial information about Lender and such Person's intentions as to the holding of the Pledged Collateral so sold for investment, for its own account, and not with a view to the distribution thereof, and (iv) as to such other matters as Lender may, in its discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(e)     Pledgor acknowledges that notwithstanding the legal availability of a private sale or a sale subject to the restrictions described above in paragraph 8(d), Lender may, in its discretion, elect to register any or all the Pledged Collateral under the Act (and any applicable state securities law) in accordance with its rights hereunder.  Pledgor, however, recognizes that Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof.  Pledgor also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner.  Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the registrant to register such securities for public sale under the Act, or under applicable state securities laws, even if Pledgor would agree to do so.

(f)     Pledgor agrees, to the maximum extent permitted by applicable law, that following the occurrence and during the continuance of an Event of Default, Pledgor will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale hereunder, and Pledgor waives the benefit of all such laws to the extent Pledgor lawfully may do so.  Pledgor agrees that such Pledgor will not interfere with any right, power and remedy of Lender provided for in this Agreement or now or hereafter existing

6

at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Lender of any one or more of such rights, powers or remedies.  No failure or delay on the part of Lender to exercise any such right, power or remedy and no notice or demand which may be given to or made upon Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against Pledgor in respect.

        (g)     Pledgor further agrees that a breach of any of the covenants contained in this Section 8 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 8 shall be specifically enforceable against Pledgor, and Pledgor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that the Secured Obligations are not then due and payable in accordance with the agreements and instruments governing and evidencing such obligations or have been fully and indefeasibly paid or otherwise satisfied.

The rights and remedies of Lender under this Agreement shall be cumulative and not exclusive of any rights or remedies which it would otherwise have.  In exercising such rights and remedies Lender may be selective and no failure or delay by Lender in exercising any right shall operate as a waiver of it, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

        9.     <u>Power of Attorney; Proxy</u>.  Upon and during the continuance of an Event of Default, Pledgor irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as its true and lawful attorney (and agent-in-fact) and Lender, or Lender's agent, may, without notice to Pledgor, and at such time or times thereafter as Lender or said agent, in its discretion, may determine, in the name of Pledgor or Lender, transfer any or all of the Pledged Collateral on the books of Lender thereof, with full power of substitution in the premises; endorse the name of Pledgor upon any checks, notes, acceptance, money orders, certificates, drafts or other forms of payment of security that come into Lender's possession; and do all acts and things necessary, in Lender's discretion, to fulfill the obligations of Pledgor under this Agreement.

Upon the occurrence of and during the continuance of any Event of Default hereunder, Lender, or its nominee, without notice or demand of any kind to Pledgor, shall have the sole and exclusive right to exercise all voting powers pertaining to any and all of the Pledged Collateral (and to give written consents in lieu of voting thereon) and may exercise such power in such manner as Lender, in its sole discretion, shall determine.  THIS PROXY IS COUPLED WITH AN INTEREST AND IS IRREVOCABLE.  The exercise by Lender of any of its rights and remedies under this Section shall not be deemed a disposition of Pledged Collateral under Division 9 of the UCC nor an acceptance by Lender of any of the Pledged Collateral in satisfaction of any of the Secured Obligations.

        10.    <u>Waiver</u>.  No delay on Lender's part in exercising any power of sale, Lien, option or other right hereunder, and no notice or demand which may be given to or made upon Pledgor by Lender with respect to any power of sale, Lien, option or other right hereunder, shall constitute a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power of sale,

Lien, option, or any other right hereunder, without notice or demand, or prejudice Lender's rights as against Pledgor in any respect.

11.     Termination.  This Agreement shall terminate and be of no further force or effect at such time as the Secured Obligations shall be paid and otherwise satisfied in full.  Upon such payment and satisfaction in full of the Secured Obligations, Lender shall deliver to Pledgor the Pledged Collateral at the time subject to this Agreement and then in Lender's possession or control and all instruments of assignment executed in connection therewith, free and clear of the Liens hereof, and terminate, or authorize the termination of, any UCC filings and, except as otherwise provided herein, all of the Pledgor's obligations hereunder shall at such time terminate.

12.     Release.  Pledgor hereby waives notice of acceptance of this Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Secured Obligations or any of Pledgor's obligations under the Loan Documents, and promptness in commencing suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon Pledgor.  No act or omission of any kind on Lender's part shall in any event affect or impair this Agreement.

(a)     Pledgor consents and agrees that Lender may at any time, or from time to time, in its discretion:

(i)     renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Secured Obligations; and

(ii)    exchange, release and/or surrender all or any of the Pledged Collateral, or any part thereof, by whomsoever deposited, which is now or may hereafter be held by Lender in connection with all or any of the Secured Obligations; all in such manner and upon such terms as Lender may deem proper, and without notice to or further assent from Pledgor, it being hereby agreed that Pledgor shall be and remain bound upon this Agreement, irrespective of the value or condition of any of the Pledged Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension, and notwithstanding also that the Secured Obligations may, at any time, exceed the aggregate principal amount thereof set forth in the Financing Agreement, or any other agreement governing any Secured Obligations. No act or omission of any kind on Lender's part shall in any event affect or impair this Agreement.

13.     Reinstatement.  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Pledgor for liquidation or reorganization, should Pledgor become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Pledgor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference", "fraudulent conveyance", or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

14.     <u>Miscellaneous</u>.  This Agreement shall be binding upon Pledgor and its successors and permitted assigns, and shall inure to the benefit of, and be enforceable by, Lender and its successors and assigns. This Agreement shall be governed by, and construed and enforced in accordance with, the internal laws in effect in the State of California without giving effect to principles of conflict of laws, and none of the terms or provisions of this Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Lender and Pledgor.  Neither Lender, nor any of its officers, directors, employees, agents or counsel shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or reckless or willful misconduct.

15.     <u>Severability</u>.  If for any reason any provision or provisions hereof are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or effect those portions of this Agreement which are valid.

16.     <u>Notices</u>.  Notices hereunder shall be given in the same manner, and at the addresses, as provided in Section 10.2 of the Loan Agreement.

17.     <u>Section Titles</u>.  The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

18.     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, which shall, collectively and separately, constitute one agreement.

*[ Signature Page Follows ]*

9

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**"BORROWER":**                                    **"LENDER":**

**HEALTH CHAIN SOLUTIONS LLC**              **DEJ FAMILY LIMITED PARTNERSHIP**

By: _____       By:_____
Name: David Swart                                   Name:_____
Title:  President & CEO                             Title:_____

**"GOODWATER":**                                   **"CLAYVARD":**

**GOODWATER HOLDINGS LLC**                  **CLAYVARD LTD.**

By:_____        By:_____
Name:_____        Name:_____
Title:_____        Title:_____

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

"BORROWER":                                    "LENDER":

**HEALTH CHAIN SOLUTIONS LLC**                 **DEJ FAMILY LIMITED PARTNERSHIP**

By:_____                     By: _Daniel E. John___
Name:_____                      Name: _DANIEL E. JOHNSON_
Title:_____                      Title: _GENERAL PARTNER_

"GOODWATER":                                    "CLAYVARD":

**GOODWATER HOLDINGS LLC**                      **CLAYVARD LTD.**

By: _R E Slerson_                               By _____
Name: _ROBERT E. SALVESON_                      Name: _L. DENEAULT JR_
Title: _MANAGING MEMBER_                          Title: _DIRECTOR_

# EXHIBIT C

**DEJ**
*Partners, LLC*
DANIEL E. JOHNSON

331 VINELAND AVENUE, CITY OF INDUSTRY, CA 92887

(310) 345-0281

DAN@DEJPLLC.COM



October 28, 2019

Health Chain Solutions LLC
3520 Mullens Way
Cincinnati, OH 45245
Attn: President

Goodwater Holdings LLC
59548 Twin Pines Drive
New Hudson, MI 48165.
Attn: Robert Salveson

Clayvard Ltd.
59-60 Cornhill, 1st Floor, London, EC3V 3PD
London, UK
Attn: Lawrence Deneault

Killgore, Pearlman, Semanie, Denius & Squires, P.A.
2 South Orange Avenue, 5th Floor
Orlando, Florida 32801
Attn: Chris W. Hayes, Esq.

Re:     **Notice of Event of Default; Enforcement of Remedy**

Ladies and Gentlemen:

Reference is made to that certain Loan Agreement (the "Loan Agreement") entered into as of July 26, 2017, by and between Health Chain Solutions LLC ("Borrower") and DEJ Partners, LLC, as successor-in-interest to DEJ Family Limited Partnership ("DEJ"), which was secured by, among other things, that certain Pledge Agreement (the "Pledge Agreement") entered into as of July 26, 2017, by and among Borrower, DEJ, Goodwater Holdings LLC ("Goodwater") and Clayvard Ltd. ("Clayvard" and, together with Goodwater, the "Pledgors"). All capitalized terms used herein which are not otherwise defined shall have the meanings set forth in the Loan Agreement.

The principal purpose of this letter is to provide Borrower and Pledgors written notice of the occurrence and continuation of certain Events of Default under the Loan Agreement and to enforce certain remedies available to DEJ under the Loan Agreement as a consequence of the such Events of Default.

Pursuant to Section 8.1(a) of the Loan Agreement, Borrower's failure to pay any

installment of principal or interest on the loan constitutes an Event of Default. All principal and interest under the loan was due and payable by Borrower to DEJ on July 26, 2019. As you know, despite numerous requests from DEJ, including the enclosed written notice of default dated July 23, 2019, Borrower has failed to pay such principal and interest amounts. As a consequence, an Event of Default described in Section 8.1 of the Loan Agreement has occurred and is continuing.

Pursuant to the Pledge Agreement, (1) Goodwater pledged to DEJ and granted to DEJ a security interest in 25,000 Membership Units (as defined in that certain Amended and Restated Operating Agreement dated as of April 2016, by and among NeoCrumb, Inc., as successor-in-interest to NeoCrumb, LLC, a Florida limited liability company ("NeoCrumb") and its members (as amended, the "LLC Agreement")) of NeoCrumb, and (2) Clayvard pledged to DEJ and granted to DEJ a security interest in 25,000 Membership Units of NeoCrumb (collectively, the "Pledged Collateral"). The Pledge Agreement secures, and the Pledged Collateral is security for, the prompt payment and performance of all obligations of Borrower under the Loan Agreement, and all obligations of Borrower now or hereafter existing under the Loan Agreement or any related loan document.

Pursuant to Section 8 of the Pledge Agreement, upon the occurrence and during the continuation of an Event of Default (and following a 90 day cure period, which ended on October 25, 2019), then at any time following written notice to Pledgor, DEJ is "authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or evidencing Pledged [Collateral] for certificates or instruments of smaller or larger denominations, to exercise the voting rights with respect thereto, to collect and receive all cash dividends and other distributions made thereon."

**This letter serves as formal notice to Borrower, Pledgor and NeoCrumb that DEJ is transferring (1) the applicable securities of NeoCrumb that resulted from its corporate conversion that represent the 25,000 Membership Units of NeoCrumb held by Clayvard and (2) the applicable securities of NeoCrumb that resulted from its corporate conversion that represent the 25,000 Membership Units of NeoCrumb held by Goodwater, all of which served as Pledged Collateral in connection with Borrower's ongoing Event of Default.**

**In connection with such foreclosure, enclosed please find Assignments Separate from Certificates signed by each of Clayvard and Goodwater. NeoCrumb and its legal counsel are empowered to effect such transfers on NeoCrumb's corporate records and issue and deliver a new stock or unit certificate for such shares or units in the name of DEJ.**

Please note that in no event shall any past or future discussions with DEJ, or any forbearance by the DEJ of any rights and remedies under the Loan Agreements, serve to (a) cause a modification of the Loan Agreements, (b) establish a custom with respect to any of the Loan Agreements, (c) operate as a waiver of any existing or future Event of Default under the Loan Agreements, (d) entitle Borrower, Pledgor or any other party to any notice or demand whatsoever beyond those required by the Loan Agreements, (e) in any way modify, change, impair affect,

diminish or release Borrower's Pledgors' or any of their respective affiliated parties' obligations or liability under the Loan Agreements or any other liability you may have to DEJ or (f) waive, limit or condition DEJ's rights and remedies under the Loan Agreements, all of which rights and remedies are expressly reserved. DEJ hereby expressly reserves all of the other continuing rights and remedies of the DEJ under the Loan Agreements, including without limitation, its right to accelerate the entire unpaid portion of the principal amount, all accrued and unpaid interest and all other amounts due DEJ under the Loan Agreements, and under any applicable law as a result of the occurrence and continuation of any Event of Default.

Should you have any questions regarding any of the foregoing, please contact me.

Very truly yours,

DEJ PARTNERS, LLC

By: _____
Dan Johnson, Manager

Enclosures

cc: Adam Miller, Esq.
    Pivotal Law Firm, Inc.